# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# WAYCROSS DIVISION

| | |
|---|---|
| TWIN PINES MINERALS, LLC, | |
| *Plaintiff*, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS; CHRISTINE E. WORMUTH, Secretary of the Army; MICHAEL L. CONNOR, Assistant Secretary of the Army (Civil Works); LTG. SCOTT A. SPELLMON, Chief of Engineers; BG. JASON E. KELLY, Commander, South Atlantic Division; COL. JOSEPH R. GEARY, Commander, Savannah District, | Civil Action No: |
| *Defendants*. | |

## COMPLAINT

Plaintiff Twin Pine Minerals, LLC's ("Twin Pines") brings this action for injunctive and declaratory relief under the Clean Water Act, 33 U.S.C. § 1251, *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*. against the U.S. Army Corps of Engineers; Christine E. Wormuth, Secretary of the United States Army, Michael L. Connor, Assistant Secretary of the Army (Civil Works), Lieutenant General Scott A. Spellmon, Commander and Chief of Engineers, U.S. Army Corps of Engineers; Brigadier General Jason E. Kelly, Commander, U.S. Army Corps of Engineers, South Atlantic Division; and Colonel Joseph R. Geary, Commander, U.S. Army Corps of Engineers, Savannah District. In support of this Complaint, Twin Pines alleges as follows:

**INTRODUCTION**

1.      This case seeks judicial review of an action by the Assistant Secretary of the Army for Civil Works (the "ASA") and U.S. Army Corps of Engineers ("Corps") seeking to assert federal Clean Water Act jurisdiction over a mining project in Charlton County, Georgia that is not subject to federal jurisdiction.

2.      For years, Plaintiff Twin Pines Minerals, LLC ("Twin Pines") has been working to construct and operate a heavy mineral-sands mine at a site in Charlton County, Georgia (the "Saunders Demonstration Mine"). The mining process is environmentally benign. It involves digging a pit; transporting sand from the pit to a processing area; using water and gravity to separate heavy minerals from the rest of the sand; and returning the remaining sand to its original location. The mine pit will then be restored to its original contours and planted with native vegetation.

3.      The Saunders Demonstration Mine will produce titanium dioxide and zirconium, which have both been identified by the Federal Government as "critical minerals." *See* 83 Fed. Reg. 23295 (May 18, 2018). Critical minerals are those deemed "essential to the economic and national security of the United States, but which the United States currently lacks the capacity to produce in the quantities needed. *See* Executive Order 13817, *A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals*, 82 Fed. Reg. 60835 (Dec. 26, 2017). It is the policy of the Federal Government to address this strategic vulnerability in a safe and environmentally responsible manner. *Id.*

4.      The Saunders Demonstration Mine will also bring badly needed, high-paying jobs to Charlton County and the surrounding areas, creating needed economic development and generating substantial state and local tax revenues. Twin Pines has developed state-of-the-art

technologies to mine these critical minerals while protecting the environment, wildlife, and the region's surface and groundwater resources.

5.      The proposed project is controversial due to its proximity to the Okefenokee National Wildlife Refuge. Opponents have asserted that Twin Pines is proposing to "mine the swamp" and/or that the proposed mine will "drain the swamp." These claims are baseless. The proposed mine site is a burnt-over commercial pine plantation more than three miles from the nearest boundary of the refuge. And, because the bottom of the mine will be higher in elevation than the water level of the swamp almost everywhere, there is literally no chance that it will "drain the swamp" — unless water can somehow drain uphill.

6.      As part of its effort to construct the Saunders Demonstration Mine, Twin Pines sought and obtained from the Corps two final "Approved Jurisdictional Determinations" ("AJDs") (the "Twin Pines AJDs") confirming that the federal government lacks jurisdiction under the Clean Water Act to regulate this project. Bowing to stakeholder pressure, however, the civilian leader of the United States Army Corps of Engineers, the ASA, issued a memorandum on June 3, 2022, unilaterally rescinding and declaring the Twin Pines AJDs "invalid" — ostensibly based on the ASA's retroactive disapproval of the tribal consultation policy in effect when the Twin Pines AJDs were issued.

7.      The Twin Pines AJDs were issued in compliance with all laws, regulations, and policies — including the tribal consultation policy — in effect when they were issued. Despite this, the ASA informed Twin Pines that it "cannot rely on those AJDs" and that Twin Pines would be required to apply for a new AJD to allow the Corps to process the AJD in accordance with a new tribal consultation policy. Moreover, the ASA stated that any new AJD would be

governed by the jurisdictional definitions currently in effect, which are substantially more expansive than the definition in effect when the Twin Pines AJDs were issued.

8.      The ASA's decision is both unlawful and unwarranted. The views of tribes are not relevant to the jurisdictional status of specific aquatic resources. But even if they were, it was arbitrary and capricious for the ASA to invalidate the Twin Pines AJDs before determining whether the tribes possess new information sufficient to justify reopening AJDs that have already been issued. On information and belief, the ASA made no attempt to ascertain whether the tribes possess any relevant information — let alone new information warranting rescission and reconsideration — before invalidating the Twin Pines AJDs.

9.      The ASA did not invalidate all AJDs issued in accordance with the Corps' historical policy of not consulting with tribes on jurisdictional determinations. Instead, the ASA singled-out two controversial mining projects (the Saunders Demonstration Mine and another project in Arizona) opposed by political leaders and key Administration stakeholders. Other AJDs issued without tribal consultation were not invalidated or rescinded and remain in effect.

10.     The ASA's decision to rescind and invalidate the Twin Pines AJDs is unlawful. If allowed to stand, this arbitrary, capricious, and unlawful agency action will prevent Twin Pines from developing the Saunders Demonstration Mine, cause years of delay, and cost tens-of-millions of dollars. This action should be set aside so that Twin Pines can continue to develop its property as the law allows.

**PARTIES**

11.     Plaintiff Twin Pines Minerals, LLC is a limited liability company organized under the laws of the State of Delaware with its principal office in Birmingham, Alabama. Twin Pines is the developer of the Charlton County Property and the recipient of the Jurisdictional

Determination that is the subject of this action. Twin Pines maintains its registered agent and does business in Charlton County, Georgia.

12.     Defendant the U.S. Army Corps of Engineers is the agency responsible for regulating discharges of dredged and fill material into Waters of the United States under Section 404 of the Clean Water Act. The Corps is the agency responsible for issuing, and then unlawfully rescinding, the Twin Pines AJDs that are the subject of this action.

13.     Defendant Christine E. Wormuth is the Secretary of the United States Army. Secretary Wormuth is the official who directs and supervises the Corps, and who ultimately is responsible for the Corps' recission of the Twin Pines AJDs that are the subject of this action. Secretary Wormuth maintains her office in Washington, D.C.

14.     Defendant Michael L. Connor is the Assistant Secretary of the Army (Civil Works). Assistant Secretary Connor is the official who directs and supervises the Corps, and who ultimately is responsible for the Corps' decision to rescind the Twin Pines AJDs that are the subject of this action. Assistant Secretary Connor maintains his office in Washington, D.C.

15.     Defendant Lieutenant General Scott A. Spellmon is the Commander and Chief of Engineers, U.S. Army Corps of Engineers. General Spellmon is the official responsible for the actions taken by the Corps related to the Twin Pines AJDs that are the subject of this action. General Spellmon maintains his office in Washington, D.C.

16.     Defendant Brigadier General Jason E. Kelly is the Division Commander of the South Atlantic Division of the U.S. Army Corps of Engineers. General Kelly is the official responsible for the actions taken by the Corps related to the Twin Pines AJDs that are the subject of this action. The Division Commander maintains his office in Atlanta, Georgia.

17.     Defendant Colonel Joseph R. Geary is the Commander of the Savannah District of the U.S. Army Corps of Engineers. Colonel Geary is the official responsible for the actions taken by the Corps related to the Twin Pines AJDs that are the subject of this action. The District Commander maintains his office in Savannah, Georgia.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); 33 U.S.C. §§ 1251 *et seq.* (Clean Water Act); and 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act).

19.     Venue rests in this Court pursuant to 28 U.S.C. § 1391(e)(1) and Local Rule 2.1(d) and (e). Specifically, venue is proper in the Southern District of Georgia, Waycross Division, because the property that is the subject of the action is located in Charlton County, Plaintiff Twin Pines is a resident of Charlton County, and a substantial part of the events giving rise to the claim occurred here.

## STATUTORY BACKGROUND

### The Clean Water Act and Section 404 Permits

20.     Section 301 of the Clean Water Act prohibits the discharge of pollutants, including dredged and fill material, into "navigable waters" without a Clean Water Act permit. 33 U.S.C. §§ 1311(a); 1362(12). Section 507 of the Clean Water Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

21.     Section 404 of the Clean Water Act authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of dredged and fill material into "navigable waters." 33 U.S.C. § 1344. For projects in Georgia, Section 404 permits are issued by the Corps' Savannah District.

22.     Because mining results in a discharge of "dredged or fill material," a Section 404 permit is required to mine within areas designated "waters of the United States."

23.     The requirement to obtain a Section 404 Permit carries significant consequences for landowners seeking to develop their property. The Clean Water Act imposes civil penalties of up to $55,800 per day per violation even for unintentional unpermitted discharges into jurisdictional waters. Landowners can be subject to administrative compliance orders and injunctions requiring them to halt any activity causing an unauthorized discharge, and potentially to spend millions to correct any knowing or unknowing violations. Criminal penalties can also be imposed even for negligent violations. 33 U.S.C. § 1319; U.S. Environmental Protection Agency, Civil Monetary Penalty Inflation Adjustment Rule, 85 Fed. Reg. 1751, 1754 (Jan. 13, 2020). Alleged violations of the Clean Water Act may be enforced by the federal government, states, and even private parties, including organizations that are ideologically opposed to activities being conducted on a private property. 33 U.S.C. §§ 1319, 1365.

24.     The process of obtaining a Section 404 Permit can take years to complete and cost millions of dollars. More than 15 years ago, the United States Supreme Court reported that the "average applicant for an individual [Section 404] permit spends 788 days and $271,596 in completing the process … not counting costs of mitigation or design changes." *Rapanos v. United States*, 547 U.S. 715, 721 (Scalia, J.) (plurality opinion). These costs have increased significantly since that time. In addition, any impacts to navigable waters that cannot be avoided must be "mitigated," usually by purchasing "mitigation credits" from an approved "mitigation bank." For large projects, mitigation credits often cost tens of millions of dollars. A Section 404 permit is not needed, and the corresponding delays and costs can be avoided, however, if jurisdictional waters can be avoided.

**Jurisdictional Waters and "Jurisdictional Determinations"**

25. For the reasons described above, landowners have a right and a need to know if waters subject to jurisdiction under the Clean Water Act are present on their land.

26. At the request of a landowner, the Corp, by regulation, issues written "jurisdictional determinations" ("JDs") stating whether jurisdictional waters are present on specific lands. 33 C.F.R. §§ 320.1(a)(6), 331.2. JDs come in two varieties: "preliminary" and "approved." 33 C.F.R. § 331.2. "Preliminary jurisdictional determinations" ("PJDs") are "advisory in nature," and merely inform landowners that jurisdictional waters "may" be present on a parcel. *Id*. "Approved jurisdictional determinations" ("AJDs"), on the other hand, are final determinations by the Corps that jurisdictional "waters of the United States" are, or are not, present on a particular site. Where jurisdictional waters are present, an AJD must precisely identify the limits of those waters determined to be jurisdictional and must set forth the basis for the Corps' jurisdictional determination. *Id.*

27. AJDs are valid and binding on the Corps for five years. Memorandum of Agreement: Determination of Geographic Jurisdiction of the Section 404 Program and Application of Exemptions Under CWA Section 404(f) dated January 19, 1989, Sec. II & VI(a). As stated by the Corps, the fixed term of an AJD "provides certainty to the regulated public and ensures their ability to rely upon approved jurisdictional determinations (formerly called final jurisdictional determinations) for a definite period of time." U.S. Army Corps of Engineers, Regulatory Guidance Letter 05-02 (June 14, 2005).

28. An AJD may be reopened by the Corps only if "new information warrants revision of the determination before the expiration date or a District Engineer has identified, after public notice and comment, that specific geographic areas with rapidly changing environmental

conditions merit re-verification on a more frequent basis." U.S. Army Corps of Engineers, Regulatory Guidance Letter 05-02 (June 14, 2005).

29.     The Savannah District describes AJDs as follows:

> An approved JD constitutes the Savannah District's official, written representation that the JD's findings are correct; can be relied upon by a landowner, permit applicant, or other "affected party" (as defined at 33 CFR 331.2) who receives an approved JD for five years (subject to certain limited exceptions explained in RGL 05-02); can be used and relied on by the recipient of the approved JD (absent extraordinary circumstances, such as an approved JD based on incorrect data provided by a landowner or consultant) if a CWA citizen's lawsuit is brought in the Federal Courts against the landowner or other "affected party," challenging the legitimacy of that JD or its determinations; can be immediately appealed through the Savannah District's administrative appeal process set out at 33 CFR Part 331.

30.     AJDs may be either "stand-alone" or associated with permit actions. A stand-alone AJD may be requested by landowners seeking to avoid impacts to jurisdictional waters — and thus to avoid the substantial delays, costs, and potential liabilities associated with Clean Water Act permits.

**Definitions of "Waters of the United States"**

31.     Despite being the jurisdictional cornerstone of the Clean Water Act, the term "waters of the United States" has not been consistently defined. Each of the past three Administrations has adopted or proposed to adopt a new definition inconsistent with the definition proposed or adopted by the prior administration — dramatically altering the legal landscape with each new interpretation of the statutory definition, which has not changed.

32.     The Obama Administration adopted a new definition significantly expanding "waters of the United States" in 2015. *See* U.S. Army Corps of Engineers and U.S. EPA, *Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37054 (June 29, 2015) (the "WOTUS Rule").

33.     This Court entered Orders preliminarily enjoining the Corps from applying or enforcing the WOTUS Rule in Georgia and ten other States in 2015 and 2016. *See Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018). In August 2019, this Court entered final judgment vacating and remanding the WOTUS Rule, finding, among other things, that the rule was not "consistent with Supreme Court precedent" and vastly expanded jurisdiction over waters and land traditionally within States' regulatory authority in violation of Clean Water Act and the Administrative Procedure Act. *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019).

34.     On April 21, 2020, the Corps and EPA published the Navigable Waters Protection Rule ("NWPR"), which redefined the phrase waters of the United States and specified which waters and wetlands would be subject to jurisdiction under the Clean Water Act. The NWPR became effective on June 22, 2020.

35.     On June 9, 2021, the Corps and EPA announced their intent to repeal the NWPR and to issue a new definition of the phrase "waters of the United States." Shortly thereafter, the Corps and EPA responded to a motion for summary judgment in a case challenging the NWPR by requesting that the rule be remanded to the agencies for reconsideration. *See, e.g.*, Defendants' Motion for Voluntary Remand Without Vacatur, ECF No. 72, *Pascua Yaqui Tribe v. EPA*, Civil Action No. 4:20-cv-00266 (D. Ariz.).

36.     On August 30, 2021, the United States District Court for the District of Arizona granted the agencies' motion to remand the rule but also vacated the rule pending reconsideration. *See Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021). The court vacated the NWPR without evaluating the merits of the plaintiffs' challenge. Based on that ruling, which the Corps acquiesced in and did not appeal, the Corps halted implementation of the NWPR nationwide.

37.     On December 7, 2021, the Corps and EPA published a proposed rule to reinstate the "pre-2015" definition of "waters of the United States." U.S. Army Corps of Engineers and EPA, *Revised Definition of "Waters of the United States,"* 86 Fed. Reg. 69372 (Dec. 7, 2021) (the "Proposed Revised Definition"). The December 7 proposal states that the agencies may further clarify their interpretation of waters of the United States in the final rule, and that they intend to publish a second rule at a later date to make additional changes.

38.     The Corps addressed the effect of the Arizona court's vacatur of the NWPR on previously issued AJDs on January 5, 2022. Headquarters, U.S. Army Corps of Engineers, Regulatory, 5 January 2022 – *Navigable Waters Protection Rule Vacatur*, *available at* https://bit.ly/Jan-5-Announcement (last visited June 16, 2022). The Corps' regulatory announcement reiterated that, "[u]nder existing Corps policy" set out in Regulatory Guidance Letter No. 05-02 § 1(a), AJDs remain "valid for five years unless new information warrants revision prior to the expiration date." *Id.* Further, the Corps acknowledged that its "actions are governed by the definition of 'waters of the United States' that is in effect at the time the Corps completes an AJD." *Id.* Thus, the Corps stated that "AJDs completed prior to the court's decision and not associated with a permit action (also known as 'stand-alone' AJDs under RGL 16-01) will not be reopened until their expiration date, unless one of the criteria for revision is met under RGL [Regulatory Guidance Letter] 05-02." *Id.*

39.     As explained below, the Twin Pines AJDs are "stand-alone" AJDs. Further, none of the criteria for revision under Regulatory Guidance Letter 05-02 is met. Nevertheless, the Corps has unlawfully and selectively reopened and rescinded the Twin Pines AJDs prior to their expiration date.

## FACTUAL ALLEGATIONS

### The Saunders Demonstration Mine

40.     For years, Twin Pines has been seeking the environmental permits and approvals needed to construct and operate the Saunders Demonstration Mine. On July 25, 2019, Twin Pines submitted an application to the Georgia Environmental Protection Division ("Georgia EPD") for a Surface Mining Permit. Twin Pines has also applied to Georgia EPD for other environmental permits necessary to construct and operate the mine. These include an NPDES Industrial Stormwater Permit; a Groundwater Withdrawal Permit, and an Air Quality Permit.

41.     On March 4, 2020, Twin Pines submitted an application for a Section 404 Permit for the Saunders Demonstration Mine to the Corps' Savannah District. Twin Pines submitted this application based on the assumption that some aquatic resources within the project area would be considered "waters of the United States" under the jurisdictional rules in effect at that time.

### The Approved Jurisdictional Determinations

42.     Twin Pines requested a jurisdictional determination after the NWPR was adopted on April 21, 2020. An AJD was issued on October 15, 2020 (the "2020 AJD"). The 2020 AJD confirmed that aquatic resources within the proposed mine site are not "waters of the United States."

43.     In issuing the 2020 AJD, the Corps delineated wetlands on the parcels in accordance with the criteria contained in the 1987 Corps Wetland Delineation Manual, as amended by the most recent regional supplements to that manual.

44.     The 2020 AJD was based on the Corps' evaluation of technical information and data collected by Corps staff on multiple visits to the properties. This information included:

- A WOTUS Delineation Report dated September 2018 and a WOTUS Connectivity Screening Report dated September 2020;

- Aerial and satellite photographs of the properties;

- Information from the Corps' Antecedent Precipitation Tool;

- A U.S. Department of Agriculture, Natural Resources Conservation Service Soil Survey;

- National Wetland Inventory maps from the U.S. Fish and Wildlife Service; U.S. Geological Survey topographic maps; and

- Information and observations collected by the Corps during site visits in November 2018 and September 2020, respectively.

45.     Based on its review of the technical information above, the Corps determined that none of the wetlands evaluated in the 2020 AJD were subject to federal jurisdiction under the Clean Water Act. The 2020 AJD confirmed 376 acres of non-jurisdictional, non-adjacent wetlands in the vicinity of the mine site do not include jurisdictional waters.

46.     The 2020 AJD states:

There are aquatic resources within the review area that are not waters of the United States and are therefore not subject to the jurisdiction of the Clean Water Act. Specifically, wetlands WC, WD, WE, WF, WG, WH, WJ, WK, WA-2, WA-3, WA-4, WA-6, WA-7, WA-8, WA-9, and ditches D1, D2, D3, and D5 as identified on the enclosed exhibits entitled "Review Area 1", "Review Area 2", "Review Area 3", "Review Area 4", and "Review Area 5", approved by this office on October 14, 2020 are non-jurisdictional. The placement of dredged or fill material into these wetlands/other waters would not require prior Department of the Army authorization, pursuant to Section 404 of the Clean Water Act (33 United States Code § 1344).

47.     The 2020 AJD states that it will remain valid for a period of 5 years. The 2020 AJD further states that it may be reopened only if "new information" warrants revision prior to that date.

48.     In reliance on the 2020 AJD, Twin Pines submitted a Revised Surface Mining Permit Application to Georgia EPD on November 13, 2020. The revised application includes a revised project boundary specifically designed to avoid jurisdictional waters.

49.     Twin Pines requested a second AJD seeking verification that certain aquatic resources on lands contiguous to the revised project boundary were not jurisdictional. A second AJD confirming this request was issued on March 24, 2021 (the "2021 AJD").

50.     In issuing the 2021 AJD, the Corps delineated wetlands in accordance with the criteria contained in the 1987 Corps Wetland Delineation Manual, as amended by the most recent regional supplements to that manual.

51.     Like the 2020 AJD, the 2021 AJD was based on the Corps' evaluation of technical information and data collected by Corps staff on multiple visits to the properties. This information included:

- WOTUS Delineation Reports dated September 2018 and July 2019, respectively;

- Prior jurisdictional determinations conducted by the Corps;

- Information from the Corps' Antecedent Precipitation Tool;

- U.S. Department of Agriculture, Natural Resources Conservation Service Soil Surveys;

- U.S. Fish and Wildlife Service National Wetland Inventory Maps;

- U.S. Geological Survey topographic maps; and

- Information and observations collected by the Corps during site visits conducted on November 27-28, 2018, and October 21-25, 2019, respectively.

52.     Based on its review of the technical information above, the Corps determined that none of the aquatic resources evaluated in the 2021 AJD were waters of the United States subject

to Clean Water Act jurisdiction. Specifically, the 2021 AJD confirmed 180 acres of non-jurisdictional, non-adjacent wetlands on lands owned by Twin Pines contiguous to the mine site.

53.     The 2021 AJD states:

> There are aquatic resources within the review area that are not waters of the United States and are therefore not within the jurisdiction of Section 404 of the Clean Water Act (33 United States Code § 1344). Specifically, ditches "6Ditch-6 NWPR, 6Ditch-2 NWPR, 7Ditch-1 NWPR, 7Ditch NWPR, 7Ditch-KEY NWPR, 7Ditch-ADK NWPR," and the wetlands labeled "Non-Adjacent Wetland" as identified on the enclosed exhibits entitled "Review Area 6" and "Review Area 7" dated November 16, 2020. The placement of dredged or fill material into these wetlands/other waters would not require prior Department of the Army authorization pursuant to Section 404.

54.     The 2021 AJD states that it will remain valid for a period of 5 years. The 2021 AJD further states that it may be reopened only if "new information" warrants revision prior to that date.

55.     In reliance on the 2021 AJD, Twin Pines revised its application to Georgia EPD to include additional acreage within the proposed project boundary.

56.     Collectively, the two Twin Pines AJDs confirm that no jurisdictional wetlands are present within the project boundary for the Saunders Demonstration Mine.

**The Corps' Historical Tribal Consultation Policies and Practices**

57.     For decades, Corps policy prohibited third parties from participating in the jurisdictional determination process. For example, in 2000, the Corps promulgated regulations governing its jurisdictional determination program. The Corps emphasized that "JDs are not subject to public interest review or third party participation." USACE, *Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers*, 65 Fed. Reg. 16486, 16488 (Mar. 28, 2000). The Corps specifically rejected the notion that third parties and adjoining landowners should be permitted to participate in the AJD process or to

appeal AJDs after they are issued, explaining that these groups lacked information relevant to

the technical and legal determinations underlying AJDs.

58.　The Corps explained:

> We do not agree that third parties should be allowed to appeal JDs because JDs are primarily site-specific evaluations of technical criteria, such as tide lines or high-water marks, hydric soils, hydrophytic vegetation, wetland hydrology, and interstate commerce connections. Adjacent landowners do not typically have knowledge of, or sufficient interest in, a property to become involved in such determinations.

59.　Notably, the Corps also declined to allow its AJD and Clean Water Act regulatory

process to be leveraged by project opponents as a means to control land-use development to

which they are opposed. The Corps explained:

> Often an adjacent landowner's interests are related to issues other than effects to aquatic resources. We believe such interests are best addressed by local land use plans and zoning ordinances rather than by seeking to control potential development by challenging Corps JDs. *Id.*

60.　The Corps issued a "Tribal Consultation Policy" in 2012 to "affirm and

formalize" the "tribal consultation procedures for the U. S. Army Corps of Engineers." The

Tribal Consultation Policy applies to the Savannah District, was in effect at all times relevant to

the claims and issues in this case, and is still in effect today.

61.　Consistent with the Corps' longstanding policy regarding third-party

participation in the AJD process, the Corps' Tribal Consultation Policy does not require tribes

to be consulted prior to issuing AJDs.

62.　In January 2021, ASA R.D. James, issued a memorandum reiterating the Corps'

policy of not consulting with tribes before making jurisdictional determinations. Memorandum

for Commanding General, U.S. Army Corps of Engineers regarding U.S. Army Corps of

Engineers (USACE) Tribal Consultation Associated with a Draft Approved Jurisdictional Determination (AJD) (Jan. 4, 2021) (the "2021 Consultation Memo").

63.     The 2021 Consultation Memo explains the Corps' rationale for declining to consult with tribes regarding AJDs. The 2021 Consultation Memo explains that consulting with tribes about the jurisdictional status of specific resources would "have no functional impact because [the Corps'] discretion is constrained by law." This is because, as ASA James explained, the Corps is bound to apply the regulatory definition of waters of the United States in making jurisdictional determinations, and the tribes' views on questions of jurisdiction are not relevant to the technical and legal determinations the Corps must make.

64.     The 2021 Consultation Memo states:

> Aquatic resources on a parcel are already subject to the [Clean Water Act], or not, based on the law. An AJD merely provides the public with specific information on the status of federal jurisdiction for the particular aquatic resources on the subject parcel for future planning and decision-making purposes. Moreover, USACE lacks authority to consider factors other than whether waters on the parcel meet the definition of waters of the United States when determining whether it has jurisdiction over the parcel, which would render any tribal consultation at the AJD stage as moot.

65.     Accordingly, the 2021 Consultation Memo reiterated "that, as a matter of nationwide programmatic policy, [the Corps] shall not initiate tribal consultation on any future AJDs. Should a tribe request consultation with respect to a given project, such consultation should be undertaken at the permit stage rather than on any AJD that may be requested." The 2021 Consultation Memo further directed that "[u]nder no circumstances shall the guidance and processes established in this memorandum be modified, supplemented, amended, or rescinded, directly or indirectly, nor shall [the Corps] take action not in accordance with the guidance herein, without the express written approval from the ASA."

66.     The Corps has stated that in March 2021 — after the first Twin Pines AJD had been issued and either shortly before or shortly after the second was issued — the Muscogee (Creek) Nation sent an email to the Savannah District inquiring about the process for tribal consultation on AJDs. The Savannah District responded on April 16, 2021, by providing the tribe with the 2021 Consultation Memo and informing the tribe that the Corps does not consult on AJDs.

67.     On April 20, 2021, Acting ASA Jamie Pinkham, rescinded the 2021 Consultation Memo. In doing so, the Acting ASA stated that one of his "first priorities" was "to review the existing USACE Tribal Consultation Policy" to ensure it is consistent with President Biden's priorities. The Acting ASA stated that, based on his review, he would "ensure any consultative requirements associated with the review and issuance of Approved Jurisdictional Determinations are included in a revised and updated policy." To date, the Corps has not updated its Tribal Consultation Policy.

68.     On April 5, 2022, nearly a year after the Acting ASA's decision to rescind the Consultation Memo, the Savannah District confirmed that Corps policy remained that it does not consult tribes on AJDs. As the Savannah District explained in a "Fact Sheet" regarding tribal consultation on the Twin Pines project:

> It should be noted that the Corps does not currently conduct, nor has it historically conducted Tribal coordination specifically on verifications of aquatic resource delineations or JDs. Aquatic resource delineation verifications and JDs are based on regulation, policy and guidance administered by the Corps and the U.S. Environmental Protection Agency (EPA). Delineation of wetlands is based on the presence or absence of three indicators: hydric soils, hydrophytic vegetation and wetland hydrology of the site, and JDs are based on traditional navigable waters (TNWs), hydrologic connectivity to TNWs, and the physical, chemical, and biological effects that aquatic resources have on downstream TNWs.

18

USACE, Savannah District, *Tribal Engagement for Twin Pines SAS 2018-00554, Summary of USACE's Tribal Coordination with the Muscogee (Creek) Nation (MCN) Regarding the Twin Pines Minerals Project* (Apr. 5, 2022), *available at* https://bit.ly/SAS-20220405 (last visited June 20, 2022).

**The Corps' Rescission of the Twin Pines AJDs**

69.     On June 3, 2022, the ASA rescinded the Twin Pines AJDs for its Saunders Demonstration Mine in Charlton County and the AJDs issued for the Rosemont mine in Arizona (the "Recission Memorandum").

70.     The Recission Memorandum directs "the Corps to immediately notify the AJD recipients for the Rosemont and Twin Pines parcels that they cannot rely on those AJDs to accurately delineate jurisdictional waters." The Recission Memorandum further states that the Twin Pines AJDs "are not valid because the government-to-government consultations for the Federal actions regarding the determinations of jurisdictional status of waters on the parcels were not conducted as requested by the Tribes."

71.     The Recission Memorandum directs the Corps "to notify the Rosemont and Twin Pines project proponents of their option to request a new AJD." The Recission Memorandum states that any newly issued AJDs will apply the definition of "waters of the United States" in effect at the time they are issued. The Recission Memorandum further states that any new AJDs will not be issued until the conclusion of any requested tribal consultation.

72.     Corps staff have informed Twin Pines that the Corps will not issue a Section 404 permit to Twin Pines without first completing an Environmental Impact Statement ("EIS") under the National Environmental Policy Act. While an EIS is not required, the decision to prepare one will cause years of additional delay for Twin Pines, further preventing it from developing its property. An EIS would not be required if the Twin Pines AJDs remained in effect.

73.     Twin Pines' Saunders Demonstration Mine and the Rosemont mine in Arizona are the only projects in United States for which AJDs were rescinded. Indeed, the Recission Memorandum claims to be based on "circumstances [that] are unique to the Rosemont and Twin Pines parcels AJDs." Accordingly, the Recission Memorandum expressly states that it "is limited to" the AJDs for the Twin Pines and Rosemont projects" and that it does not "establish or rescind any separate, nationwide policy guidance."

74.     The Recission Memorandum does not identify the purportedly unique circumstances related to the Twin Pines AJDs that warranted recission. Nor does the Recission Memorandum identify any new information relevant to the determination of jurisdiction that warranted revision.

75.     On June 3, 2022, the same day the Recission Memorandum was issued, the Corps published a notice in the Federal Register stating its intent to update the 2012 Tribal Consultation Policy, which was in effect at the time the Twin Pines AJDs and Recission Memorandum were issued. U.S. Army Corps of Engineers, Notice of Virtual Public and Tribal Meetings Regarding the Modernization of Army Civil Works Policy Priorities; Establishment of a Public Docket; Request for Input, 87 Fed. Reg. 33756 (June 3, 2022).

76.     The Corps' June 3, 2022 Federal Register notice states that the Corps intends to update its 2012 Tribal Consultation Policy and solicits public and Tribal input regarding the update. The June 3 notice specifically states that the Corps "intends to address Tribal consultation requirements for approved jurisdictional determinations issued by the Corps' Regulatory Program in the update to the Corps' Tribal Consultation Policy." The public comment period regarding this policy update does not close until August 2, 2022.

**Georgia EPD's Decision to Halt Processing**
**of Twin Pines' Permit Applications**

77.    On June 7, 2022, Georgia EPD released a "Permitting Update" based on the

Corps' decision to rescind the Twin Pines AJDs. The Permitting Update states that Georgia EPD

is halting all work on Twin Pines' applications for the other environmental permits it requires

until all issues related to Clean Water Act jurisdiction have been resolved.

78.    Georgia EPD's Permitting Update states:

> Given the Corps' recent action, Georgia EPD is deferring action on
> all applications for the Demonstration Mine until either any required
> 404 permit is issued by the Corps, the Corps determines that a new
> AJD is no longer needed, or the Corps determines that a 404 permit
> is not required. Following the conclusion of the federal process, EPD
> will assess what permits are required for the proposed Demonstration
> Mine and determine the best process for consideration of these permit
> applications moving forward.

**CAUSES OF ACTION**

**Count One**
**(Administrative Procedure Act)**

79.    Twin Pines adopts and incorporates Paragraphs 1 through 78 of this Complaint

as if fully set forth herein.

80.    The decision to rescind the Twin Pines AJDs constitutes final agency action

subject to judicial review under the Administrative Procedure Act.

81.    The decision to rescind the Twin Pines AJDs represents the culmination of the

Corps' decision to invalidate the Twin Pines AJDs.

82.    By eliminating the safe-harbor created by the Twin Pines AJDs, exposing Twin

Pines to liability from which it was previously shielded, subjecting Twin Pines to a new and

different legal regime to determine Clean Water Act jurisdiction over waters and wetlands on its

property, and directly causing Georgia EPD to cease processing necessary State permits, the decision to rescind the Twin Pines AJDs had immediate legal consequences for Twin Pines.

83.     Twin Pines has not failed to exhaust any administrative remedy available to it to challenge the decision to rescind the Twin Pines AJDs. The decision is not an "appealable action" as defined by 33 C.F.R. § 331.2 and therefore is not subject to appeal under the Corps' administrative procedures for reviewing AJDs. No other administrative remedies exist.

84.     The decision to rescind the Twin Pines AJDs adversely affects substantial legally protectible interests of Twin Pines.

85.     The decision to rescind the Twin Pines AJDs should be held unlawful and set aside under 5 U.S.C. § 706(2) as arbitrary and capricious, an abuse of discretion, not in accordance with law, contrary to a constitutional right and privilege, and without observance of procedure required by law, for at least the following reasons:

a)  The decision is contrary to law and violates the Corps' applicable rules and regulations and individual assurances provided to Twin Pines by the Corps by invalidating the Twin Pines AJDs prior to their expiration date despite the absence of new information or any other circumstance described in RGL 05-02.

b)  The decision constitutes impermissible retroactive application of the ASA's disapproval of the Corps' historical tribal consultation policies, which were fully in effect when the Twin Pines AJDs were issued. The ASA failed to identify any interest warranting retroactive application of this decision to the Twin Pines AJDs sufficient to counterbalance the resulting inequities.

c)  The decision constitutes an unexplained and unjustified reversal of long-standing Corps policy and precedent.

d)  The decision fails to provide a substantial justification for upsetting reliance interests of affected parties.

e)  The decision is based on an arbitrary and capricious decision by the ASA to consult with tribes about matters the previous ASA correctly determined the Corps is not lawfully permitted to consider as part of a jurisdictional determination and that are not relevant to the determination of Clean Water Act jurisdiction.

f)  The decision is arbitrary and capricious because, even assuming tribes could provide information relevant to a jurisdictional determination, the ASA failed to solicit and evaluate any such information prior to taking the extreme and unjustified step of invalidating the Twin Pines AJDs.

**Count Two**
**(Procedural Due Process)**

86.    Twin Pines adopts and incorporates Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

87.    The Fifth Amendment provides that certain substantive rights, including property, cannot be infringed without due process of law.

88.    The Fifth Amendment protects property interests created or recognized by State law. Under Georgia law, a license, permit, or approval granting rights that may be suspended or revoked only in certain circumstances creates a "vested right" and a property interest subject to the Fifth Amendment's due process protections.

89.    The AJDs grant rights to Twin Pines that can be suspended or revoked only in the limited circumstances set forth in the Corps' RGL 05-02.

90.    Twin Pines made substantial expenditures, incurred substantial obligations, and substantially changed its position in reliance upon the Twin Pines AJDs and the Corps' assurance

23

that they would remain in effect for five years except in limited circumstances set forth in RGL 05-02.

91.     The Twin Pines AJDs create vested rights and protectable property interests subject to Fifth Amendment protections.

92.     Twin Pines was not given notice, an opportunity to comment, a hearing, or even a courtesy call prior to the ASA's decision to rescind the Twin Pines AJDs and declare them "invalid."

93.     The ASA's decision to rescind the Twin Pines AJDs without constitutionally adequate procedure violated Twin Pines' Fifth Amendment right to procedural due process and caused substantial injury to Twin Pines.

94.     The unconstitutional decision to rescind the Twin Pines AJDs should be set aside and the AJDs should be reinstated.

**Count Three**
**(Substantive Due Process)**

95.     Twin Pines adopts and incorporates Paragraphs 1 through 78 and Paragraphs 87 through 91 of this Complaint of this Complaint as if fully set forth herein.

96.     The Fifth Amendment's guarantee of "substantive due process" prohibits the government from infringing a protectable property interest for improper motives or by means that were pretextual, arbitrary and capricious, or without any rational basis.

97.     The determination of jurisdiction is a technical determination based on hydrologic facts and the standards set forth in the regulatory definition of "waters of the United States." The views of States, tribes, and other stakeholders are not relevant to this determination.

98.     On information and belief, the ASA made no effort to ascertain whether the Muscogee (Creek) Nation possessed any information that could be potentially relevant to the

determination of jurisdiction before taking the extreme step of invalidating the Twin Pines AJDs, which were correctly issued in accordance with the regulations, standards, procedures and policies in effect at the time they were issued.

99.    On information and belief, the stated basis for the decision to rescind the Twin Pines AJDs — namely, the ASA's dissatisfaction with the tribal consultation policies admittedly in effect when the AJDs were issued — is pretextual and not the real reason for the decision. Rather, the decision to rescind the Twin Pines AJDs is based on stakeholder and Administration opposition to the Saunders Demonstration Mine; a desire to invalidate the Twin Pines AJDs, which were issued pursuant to the NWPR, so the current Administration may conduct a new jurisdictional analysis using the Administration's preferred and more expansive jurisdictional rule; and an intent to inhibit Twin Pines from developing its property as the law and the Constitution allow.

100.    This lawless, pretextual action violates Twin Pines' constitutional guarantee of substantive due process. Accordingly, the decision to rescind the Twin Pines AJDs should be declared unlawful and set aside and the Twin Pines AJDs should be reinstated.

## Count Four
### (Equal Protection)

101.    Twin Pines adopts and incorporates Paragraphs 1 through 78 and Paragraphs 87 through 91 of this Complaint of this Complaint as if fully set forth herein.

102.    The Fifth Amendment to the United States Constitution guarantees equal protection of the laws.

103.    By its terms, the ASA's decision rescinding the Twin Pines AJDs applies only to Twin Pines and one other project in the entire United States.

104.   The decision rescinding the Twin Pines AJDs treats Twin Pines selectively compared to other similarly situated property owners to whom the Corps issued AJDs under the old policy that prohibited consulting with tribes.

105.   On information and belief, the stated basis for the decision to rescind the Twin Pines AJDs — namely, the ASA's dissatisfaction with the tribal consultation policies admittedly in effect when the AJDs were issued — is pretextual and not the real reason for the decision. Rather, the decision to rescind the Twin Pines AJDs is based on Administration and stakeholder opposition to the Saunders Demonstration Mine; a desire to invalidate the Twin Pines AJDs, which were issued pursuant to the Trump Administration's NWPR, so current Administration may conduct a new jurisdictional analysis using the Administration's preferred and more expansive jurisdictional rule; and intent to inhibit Twin Pines from developing its property as the law and the Constitution allow.

106.   There is no rational basis for the decision to rescind the Twin Pines AJDs.

107.   Accordingly, the decision to rescind the Twin Pines AJDs should be declared unlawful and set aside and the Twin Pines AJDs should be reinstated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Twin Pines prays for judgment as follows:

1.  An order vacating and setting aside the decision to rescind the Twin Pines AJDs;

2.  An order declaring that the Twin Pines AJDs remain valid and tolling the period for their expiration from June 3, 2022 (the date of their purported rescission) until such relief is granted;

3.  An order enjoining Defendants from asserting jurisdiction over the aquatic resources declared non-jurisdictional in the two AJDs;

4.  For an award of attorneys' fees, expenses, and costs; and

5.  For such other relief as the Court deems proper and just.

RESPECTFULLY SUBMITTED this 22nd day of June, 2022.

JONES FORTUNA LP

GILBERT HARRELL SUMERFORD & MARTIN, P.C.

*/s/ Lewis B. Jones*
Lewis B. Jones*
 Georgia Bar No. 402498
John L. Fortuna*
 Georgia Bar No. 435149

111 New Street, Suite A
Decatur, GA 30030
(404) 850-6138
ljones@jonesfortuna.com
jfortuna@jonesfortuna.com

*/s/ Mark D. Johnson*
Mark D. Johnson
 Georgia Bar No. 395041

777 Gloucester Street
Suite 200
Post Office Box 190
Brunswick, Georgia 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Pro hac vice applications pending*

*Counsel for Twin Pines Minerals, LLC*