# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

TWIN PINES MINERALS, LLC,

     *Plaintiff*,

v.

U.S. ARMY CORPS OF ENGINEERS;
CHRISTINE E. WORMUTH, Secretary of
the Army; MICHAEL L. CONNOR,
Assistant Secretary of the Army (Civil
Works); LTG. SCOTT A. SPELLMON,
Chief of Engineers; BG. JASON E. KELLY,
Commander, South Atlantic Division; COL.
JOSEPH R. GEARY, Commander, Savannah
District,

     *Defendants*.

Civil Action No: 5:22-cv-00036-LGW-
BWC

---

**PLAINTIFF TWIN PINES MINERALLS, LLC'S MOTION FOR PRELIMINARY
INJUNCTION AND BRIEF IN SUPPORT**

Pursuant to Local Rule 7 and Federal Rule of Civil Procedure 65, Plaintiff Twin Pines
Minerals, LLC ("Twin Pines") files this Motion for Preliminary Injunction and Brief in Support.
In support of its motion, Twin Pines shows the Court as follows:

## INTRODUCTION

Twin Pines has been working with state and federal agencies for the past 5 years to obtain
the permits necessary to construct a heavy mineral-sands mine in Charlton County. The mine site
is a former commercial pine plantation denuded by fire in 2017. It is located downstream and 3
miles away from the southeast corner of the Okefenokee National Wildlife Refuge and will have
no impact on it. The mine will not drain or pollute the swamp, and the State of Georgia will not
grant the permits necessary to construct it if there is any risk that it will. The company understands
the need for robust environmental review and is committed to participating fully in the permitting

process and protecting the environment. It is also committed to following the law. The United States Army Corps of Engineers (the "Corps") does not appear to share that commitment, however.

Twin Pines commenced this lawsuit because the civilian leader of the Corps, the Assistant Secretary of the Army for Civil Works ("ASA"), on June 3, 2022, abruptly invalidated two approved jurisdictional determinations ("AJDs") the Corps had issued to Twin Pines to confirm that federal Clean Water Act permits would not be required for the proposed mine. This decision will cause irreparable harm to Twin Pines each day until it is set aside. Reasonably relying on explicit written assurances provided in the AJDs, Twin Pines substantially changed its position by abandoning a federal permit application it had spent 27 months and millions of dollars pursuing. The ostensible basis for the ASA's action is a post-issuance "policy decision" by the ASA that a request by the Muscogee (Creek) Nation to consult on the AJDs should have been granted, even though such consultations were explicitly prohibited by policies in effect at the time the AJDs were issued. The ASA's decision to invalidate already-final AJDs violated long-established Corps policy and express assurances provided to Twin Pines. The ASA did not acknowledge or attempt to justify these violations. He also did not acknowledge or attempt to justify the harm they will cause to Twin Pines.

The justification given by the ASA appears to be pretextual. The stated objective of consulting with the tribe could easily have been accomplished without invalidating the AJDs and infringing upon Twin Pines' vested rights. There was no reason for the ASA to invalidate the AJDs *before* ascertaining whether the tribes possess new information warranting such action. By acting first and asking questions later, however, and thus invalidating the AJDs without any substantive basis to do so, the ASA's action will require Twin Pines to restart the federal permitting process from the very beginning with a new AJD based on the current Administration's preferred definition

2

of "waters of the United States." The new jurisdictional definition could not be applied to Twin Pines' project unless and until the AJDs were invalidated. Hence the June 3 memorandum.

The public interest supports requiring the Corps to honor its commitments, acknowledge the reasons for its actions, and play by the rules it claims to follow. The public interest also supports allowing this project to proceed subject to the appropriate administrative and environmental review. As Georgia EPD will confirm before allowing the project to proceed, the mining process is clean and safe and poses no risk to the environment. The proposed mine will produce minerals, including titanium and zirconium, that have been identified by the federal government as "critical" because they are essential to the national economy and national defense but are in short supply. The project will also generate hundreds of high-paying jobs and double the county's tax revenue. It is strongly supported by the Charlton County Board of Commissioners.

The ASA's attempt to block this project by asserting jurisdiction the federal government does not possess — and by using pretextual justifications to achieve unstated objectives — is arbitrary and capricious and unlawful. Because the criteria for a preliminary injunction are met, the ASA's attempt to invalidate the AJDs should be enjoined immediately.

## LEGAL FRAMEWORK

### I.   The Clean Water Act and "Waters of the United States"

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Act prohibits the unpermitted "discharge of any pollutant" into "navigable waters," which the Act defines as the "waters of the United States, including the territorial seas." *Id.* § 1311(a), § 1362(12), (7). Penalties for violations of the Act are severe. Unknowing violations are subject to civil penalties of up to $59,973 per violation, per day. 33 U.S.C. § 1319(d); 87 Fed. Reg. 1676,

1678 (Jan. 1, 2022) (Table 1) (civil monetary penalty inflation adjustments). Even negligent violations are punishable by criminal fines and imprisonment. 33 U.S.C. § 1319(c)(1).

The Act requires anyone discharging pollutants into navigable waters to obtain a permit. *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1361 (S.D. Ga. 2018). Under Section 404 of the Act, permits authorizing the placement of "dredged or fill" material into waters of the United States are issued by the U.S. Army Corps of Engineers. 33 U.S.C. § 1344. Obtaining a Section 404 permit can cost hundreds of thousands of dollars and take years. *Pruitt*, 326 F. Supp. 3d at 1361; *see also Rapanos v. United States*, 574 U.S. 715, 721 (2006) (Scalia, J.); Ex. 1, Stanford Decl. ¶ 21. The costs and delays for major projects can be much more substantial, easily requiring several years to complete and costing tens-of-millions of dollars. Stanford Decl. ¶¶ 21-22.

Despite being the jurisdictional cornerstone of the Clean Water Act, the agencies charged with issuing and enforcing Clean Water Act permits — the Corps and the U.S. Environmental Protection Agency, respectively — have failed to develop a stable, consistent definition of "waters of the United States." Each of the past three Administrations has adopted or proposed to adopt a new definition inconsistent with the definition proposed or adopted by the prior Administration.

The Obama Administration issued an expansive new definition, called the "WOTUS Rule," in 2015. 80 Fed. Reg. 37054 (June 29, 2015). This Court preliminarily enjoined and ultimately set this rule aside. *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018) (enjoining rule); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019) (granting plaintiffs' motion for summary judgment and remanding rule). The Trump Administration took steps to rescind the WOTUS Rule almost immediately, *see* Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Mar. 3, 2017); *Pruitt*, 326 F. Supp. 3d at 1362, and issued a new definition, the "Navigable Waters Protection Rule" ("NWPR"), in 2020, 85 Fed. Reg. 2250 (Apr. 21, 2020). Just hours after taking office, President

Biden signed an Executive Order rescinding the prior Administration's directives regarding the WOTUS Rule and instructing the agencies to review the NWPR. Exec. Order 13,990 (Jan. 20, 2021), 86 Fed. Reg. 7037 (Jan. 25, 2021). The Biden Administration on December 7, 2021, proposed a revised definition based on the Administration's understanding of the Corps' 1986 regulations, with "amendments in certain places." 86 Fed. Reg. 69372 (Dec. 7, 2021) (proposed rule). No final action has been taken on this latest proposal, which also states that the Administration intends to promulgate an entirely new definition of waters of the United States in a future rulemaking that "would build upon [its] proposed rule." 86 Fed. Reg. at 69374.

Meanwhile, challenges to the Trump Administration's NWPR continued even after the Biden Administration declared it would rescind and revise it. In one challenge pending before the U.S. District Court for the District of Arizona, the agencies declined to defend the rule, instead requesting that it be remanded "while they work to revise or replace the rule and re-define 'waters of the United States.'" *Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 953 (D. Ariz. 2021). The court granted this request and vacated the NWPR pending reconsideration. *See id.* at 954–57. "In light of that order," in which the agencies acquiesced, "the agencies have halted implementation of the [NWPR] nationwide and are interpreting 'waters of the United States' consistent with the pre-2015 regulatory regime until further notice."[1]

## II.    <u>Section 404 Permits and Jurisdictional Determinations</u>

The tug-of-war over Clean Water Act jurisdiction has created problems for landowners seeking to comply with it. Many activities result in a discharge of "dredged or fill material" (including dirt), and thus require a permit if undertaken on land the agencies consider "waters of

---

[1] *See* EPA, Definition of "Waters of the United States": Rule Status and Litigation Update, *available at* https://bit.ly/Rule-Status.

the United States." Moreover, the Corps has historically interpreted that phrase broadly "to include land areas occasionally or regularly saturated with water — such as 'mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, [and] playa lakes' — the 'use, degradation or destruction of which could affect interstate or foreign commerce.'" *U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 594 (2016) (quoting 33 C.F.R. § 328.3(a)(3) (2012)). Given that the agencies have used this definition "to assert jurisdiction over '270–to–300 million acres of swampy lands in the United States—including half of Alaska and an area the size of California in the lower 48 States,'" it is often difficult at best "to determine whether a particular piece of property contains waters of the United States." *Id.* (quoting *Rapanos*, 574 U.S. at 722 (Scalia, J.)). Given the "important consequences" and significant penalties for violations of the Clean Water Act, *see id.*, landowners need to know whether the agencies will consider their lands to be jurisdictional waters.

"Jurisdictional determinations" are the tools used by the Corps to answer this question for landowners. *Id.* at 595; 33 C.F.R. § 331.2. An "approved jurisdictional determination," or "AJD," is a "a Corps document stating the presence or absence of waters of the United States on a parcel or a written statement and map identifying the limits of waters of the United States on a parcel." 33 C.F.R. 331.1(a). Recognizing that the "regulated public" requires "certainty," and thus must be "ab[le] to rely upon approved jurisdictional determinations … for a definite period of time," AJDs state they will remain valid for five years, during which time they can be revised only if warranted by "new information."[2] Under a longstanding Memorandum of Agreement between the Corps and EPA, the Corps is tasked with issuing AJDs except in certain narrow circumstances not applicable

---

[2] Ex. 2, Regulatory Guidance Letter 05–02, Expiration of Geographic Jurisdictional Determinations of Waters of the United States, at 1 (June 14, 2005); *see also Hawkes*, 578 U.S. at 597–98.

here.[3] AJDs issued "pursuant to the terms of th[e] MOA" are "'binding on the Government and represent the Government's position in any subsequent Federal action or litigation concerning that final determination." *Hawkes*, 578 U.S. at 598 (quoting 1989 Memorandum of Agreement, §§ IV-C-2, VI-A).

## III.   **Government-to-Government Consultations**

The Corps engages in government-to-government consultation with state and tribal governments on many issues, but this practice has never included jurisdictional determinations. The Corps issued a "Tribal Consultation Policy" in 2012 to "affirm and formalize" the "tribal consultation procedures for the U. S. Army Corps of Engineers."[4] The Tribal Consultation Policy, which is still in effect today, does not require consultation regarding AJDs. Consistent with this policy and the Corps' longstanding decision to restrict third parties' participation in the AJD process, *see* 65 Fed. Reg. 16486, 16488 (Mar. 28, 2000), "the Corps does not currently conduct, nor has it historically conducted Tribal consultation … on [jurisdictional determinations]."[5]

In January 2021, the prior ASA, R.D. James, issued a memorandum endorsing this longstanding practice and directing as a matter of "nationwide programmatic policy" that the Corps should not consult on jurisdictional determinations, even when specifically requested by a tribe.[6] As explained in greater detail below, *infra* at 18, ASA James reasoned that tribal consultation can

---

[3] *See* Memorandum of Agreement Between the DOA and EPA Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions Under 404(f) of the Clean Water Act (1989), *available at* https://bit.ly/1989-MOA.

[4] *See* U.S. Army Corps of Engineers Tribal Consultation Policy and Related Documents at 1, *available at* https://bit.ly/2012-Tribal-Consultation.

[5] Ex. 3, USACE, Tribal Engagement for Twin Pines SAS 2018-00554 at 1 (Apr. 5, 2022).

[6] Ex. 4, U.S. Army Corps of Engineers (USACE) Tribal Consultation Associated With A Draft Approved Jurisdictional Determination (AJD) (Jan. 4, 2021).

have "no functional impact" on an AJD, because the views expressed by tribes are not relevant to the criteria for such determinations, which are prescribed by law, *id.* at 2.

After President Biden took office, Acting ASA Jamie Pinkham rescinded this directive in a memorandum issued on April 20, 2021.[7] The April 20, 2021 memorandum did not, however, establish a new policy stating when and how such consultations would be conducted. Instead, the Acting ASA stated one of his first priorities would be to "review the existing USACE Tribal Consultation Policy" and "ensure any consultative requirements associated with the review and issuance of Approved Jurisdictional Determinations are included in a revised and updated policy." *Id.* No "revised and updated policy" has been issued to date.

On June 3, 2022 — the same day the ASA invalidated Twin Pines' AJDs based on alleged violations of the Corps' evolving "policy" regarding tribal consultations — the Army announced that it "intends to address Tribal consultation requirements for approved jurisdictional determinations" in a future update to its current policies, and "solicit[ed] input on conducting Tribal consultations on approved jurisdictional determinations as a policy matter." 87 Fed. Reg. 33756, 33758 (June 3, 2022). The public comment period remains open until August 2, 2022. *Id.*

## FACTS

### I.    <u>Twin Pines Seeks to Mine Heavy Mineral Sands in Charlton County, Georgia</u>

Heavy minerals sands are sediments containing dense minerals that accumulate with sand, silt, and clay in coastal environments. Stanford Decl. ¶¶ 4-6. Minerals and metals derived from these sediments are in high demand around the world. Two such products — titanium and zirconium — have been identified by the federal government as "critical minerals," which means

---

[7] Ex. 5, Rescission of Previous Guidance — Tribal Consultation Associated with Approved Jurisdictional Determinations (AJD), at 1 (Apr. 20, 2021).

they have been determined to be essential to the economic or national security of the U.S. but are vulnerable to supply chain disruptions. Stanford Decl. ¶ 7; 87 Fed. Reg. 10381 (Feb. 24, 2022). The U.S. Geological Survey has found that the "extensive heavy-mineral sand deposits in the southeastern U.S. coastal plain represent an enormous, under-utilized domestic source of these mineral resources." Stanford Decl. ¶ 6.

Since 2017, Twin Pines has been working to develop a heavy mineral-sands mine in Charlton County. Ingle Decl. ¶ 4. The mine site is located on "Trail Ridge," approximately 3 miles away from the southeastern corner of the Okefenokee National Wildlife Refuge and even further from the swamp itself (approximately 11 miles from the nearest canoe trail accessible by the public). Stanford Decl. ¶¶ 8-9. The site was managed intensively as a commercial pine plantation for most of the past century before being denuded by the West Mims fire in 2017. *Id.* ¶ 9. It is bounded to the south by Highway 94 and the Norfolk Southern Railway. *Id.* To date, Twin Pines has invested more than $47 million in the development of the mine, including more than $14.7 million to acquire property for the mine, $13.5 million to purchase, transport, and maintain mining and mineral processing equipment, $3 million for exploration, research, and development costs, and more than $16 million for permitting and engineering costs. Ex. 6, Ingle Decl. ¶ 4.

The state-of-the-art mining process developed by Twin Pines is clean and poses no risk to the Okefenokee Swamp or to the environment. The process consists of excavating sand; using water, gravity, and centrifugal force to separate heavy minerals from the sand; returning the remaining sand by conveyor to the excavation site; and then further separating and concentrating the minerals at the adjacent processing plant. Stanford Decl. ¶¶ 10-11. And because the mine site is at a higher elevation than the swamp — and the company will rarely, if ever, dig any lower than its surface elevation, *see id.* — there is literally no chance this operation will "drain the swamp."

Nor is there any chance of polluting it. No chemicals will be used at any point, and the facility will discharge no water. All water used to separate heavy minerals from sand will be captured and either reused or evaporated. Because the site is located downstream of the swamp, any stormwater leaving the site would flow away from it, anyway. *Id.* ¶ 10.

Though clean and safe by nature, the mining operation will also be regulated by the State of Georgia. Twin Pines has applied to the Georgia Environmental Protection Division ("Georgia EPD") for a Surface Mining Permit under the Georgia Surface Mining Act, Stanford Decl. ¶ 13; O.C.G.A. §§ 12-4-70 et seq.; Ga. Rules & Regs. r. 391-3-3, which requires Georgia EPD approval of Twin Pines' mining plan to ensure the proposed mine is "consistent with land use in the area" and protective of "contiguous natural and other resources," *id.* 393-3-3-.05. Other permits regulating specific environmental aspects will also be required. These include an NPDES Industrial Stormwater Permit to ensure that any rainwater leaving the site is clean; a Groundwater Withdrawal Permit to ensure that groundwater pumping does not deplete the aquifer; and an Air Quality Permit to ensure dust is controlled and air quality standards are met. Stanford Decl. ¶ 13.

## II.   Twin Pines Reasonably Relied on Jurisdictional Determinations Issued by the Corps

Based on the jurisdictional rules in effect at the time, Twin Pines applied to the Corps for an individual Section 404 permit on July 3, 2019. Stanford Decl. ¶ 25. Twin Pines' original permit application covered approximately 2,400 acres. Based on comments received and discussions with the Corps, however, the company revised its application to reduce the project area substantially. The new concept was to proceed with a smaller project, the "Saunders Demonstration Mine," that will be economically viable in its own right, while demonstrating that the mining operation will not harm the environment and that groundwater models (already subject to searching review) showing negligible impact are correct and properly calibrated. *Id.*

10

After the NWPR took effect in June 2020, Twin Pines requested an AJD on July 20, 2020 to delineate jurisdictional areas under the new rule. Stanford Decl. ¶ 26. During a site visit conducted on September 16, 2020, however, it became apparent that seven additional areas in the mine site were likely non-jurisdictional under the new rule. Twin Pines thus withdrew its initial request and submitted new requests covering the seven additional areas. The first of these, which covered areas 1 through 5, was submitted on September 25, 2020 and granted on October 15, 2020 (the "2020 AJD"). *Id*. ¶¶ 26-27, 29-33 & Ex. A; Ingle Decl. ¶ 7. The 2020 AJD explicitly states it will remain valid for 5 years. Stanford Decl., ¶ 33 & Ex. A at 1.

Based on the 2020 AJD, Twin Pines determined that the remaining jurisdictional areas within the proposed mine site could be preserved by redrawing the project boundary to avoid them. Thus, relying on the Corps' assurance that the 2020 AJD would remain valid for five years, Twin Pines reconfigured its project to avoid jurisdictional areas and withdrew its application for a Section 404 Permit. The company submitted a Revised Surface Mining Permit Application for the new proposed area to Georgia EPD on November 13, 2020. *Id*. ¶¶ 35-37; Ingle Decl. ¶¶ 7-8.

After the 2020 AJD was issued, Twin Pines submitted a second request for an AJD on November 19, 2020, which covered areas 6 and 7, discussed above. Stanford Decl. ¶ 28. The Corps granted this request and issued a second AJD on March 24, 2021 (the "2021 AJD"). *Id*. ¶¶ 28-32, 34 & Ex. B. Twin Pines later revised its application to Georgia EPD on June 25, 2021 to incorporate one additional wetland deemed non-jurisdictional in the 2021 AJD. *Id*. ¶ 37.

## III.     After the NWPR was Vacated, the Corps Stated the AJDs Would Not Be Affected

After the district court in Arizona vacated the NWPR on August 30, 2021, opponents of Twin Pines' project asserted that the court's action "compel[ed] revocation" of Twin Pines' AJDs. For example, the Southern Environmental Law Center urged EPA either to use the *Pascua Yaqui*

vacatur as a basis to revoke the AJDs or to "exercise its 'special cases' authority" under the 1989 Memorandum of Agreement, discussed above, to achieve the same result.[8] EPA did neither.

The Corps addressed the effect of the *Pascua Yaqui* court's decision on AJDs in a Regulatory Announcement dated January 5, 2022.[9] While stating that the Corps would not rely upon approved jurisdictional determinations based on the NWPR for any future regulatory action, the Corps reiterated that AJDs remain "valid for five years unless new information warrants revision prior to the expiration date." *Id.* at 2. Acknowledging that "the agencies' actions are governed by the definition of 'waters of the United States' that is in effect at the time the Corps completes an AJD," the Corps confirmed that, if no further agency action (such as a permit) is required, AJDs "completed prior to the court's decision and not associated with a permit action … will not be reopened until their expiration date" unless one of the criteria for revision under Regulatory Guidance Letter 05-02 is met. *Id.*

## IV.    On June 3, 2022, the ASA Invalidated Twin Pines' AJDs Without Notice

On June 3, 2022, Senator Jon Ossoff announced on Twitter that he had "successfully secured restored protection of Okefenokee National Wildlife Refuge."[10] As Twin Pines soon learned from a reporter, the Senator's press release was based on a directive issued by the ASA — according to Senator Ossoff, "at Senator Ossoff's request." *Id.* In a memorandum issued the same day, the ASA directed the Corps "to immediately notify" Twin Pines that it can no longer rely on

---

[8] *See* E&E News, Ga. titanium mine caught in WOTUS crosshairs, Feb. 8, 2022, *available at* https://www.eenews.net/articles/ga-titanium-mine-caught-in-wotus-crosshairs/

[9] Ex. 7, Headquarters, U.S. Army Corps of Engineers, 5 January 2022 – Navigable Waters Protection Rule Vacatur (Jan. 5, 2022), *available at* https://bit.ly/NWPR-Jan5.

[10] *See* @Sen Ossoff (June 3, 2022), *available at* https://bit.ly/Ossoff-Twitter; *see also* Ex. 8, Statement of U.S. Sen. Ossoff, Sen. Ossoff Secures Restored Protection of Okefenokee National Wildlife Refuge (June 4, 2022), *available at* https://bit.ly/Ossoff-Stmt.

either AJD "to accurately delineate jurisdictional waters under the current regulatory regime" and that its "AJDs are not valid."[11] The ostensible basis for this directive was a "policy decision" by the ASA "that the Corps should have honored" a prior request by the Muscogee Creek Nation to consult on Twin Pines' AJDs. *Id.* The incidental impact of the decision is much greater than the stated objective of consulting with the tribe, however. As discussed below, the consultation will have no effect on the AJDs or Twin Pines, but the incidental effects will be enormous. As Senator Ossoff stated in his press release:

> This action by the Army Corps, at Senator Ossoff's request, will stop the proposed mining project from proceeding, protecting the Okefenokee Wildlife Refuge from potential destruction. If any mining company wanted to proceed with a project, they would have to start over from the beginning of the jurisdictional review process under the Biden Administration's new rules. Ex. 8 at 3.

The record is unclear when or if the "prior request" cited by the ASA as a basis for this decision was made. The ASA cites an "April 10, 2020" letter from the Muscogee Creek Nation in which the tribe allegedly "stated that they had not been officially consulted on the Twin Pines AJDs as required." Rescission Memo at 1, 2. Either the date of that letter or the ASA's description of it is wrong, however, because Twin Pines did not even submit its initial AJD request until July 20, 2020, and the request resulting in the 2020 AJD was not submitted until September 25, 2020 — both well after the date cited by the ASA. Stanford Decl. ¶¶ 26-27. An April 5, 2022 memorandum prepared by the Savannah District, in contrast, states that the tribe had inquired "via email about the process for tribal consultation on JDs" at some point "during March 2021." Ex. 3 at 3. It does not state whether this inquiry was made before or after the second AJD was issued on March 24, however. The Savannah District's memo indicates that the Corps responded to this

---

[11] Ingle Decl., Ex. C, Approved Jurisdictional Determinations (AJDs) for the Rosemont and Twin Pines Parcels, at 2 (June 3, 2022) ("Rescission Memo").

inquiry by providing a copy of the ASA's directive prohibiting such consultations, and also that the tribe was notified when that policy was rescinded on April 20, 2021. *Id.*

Notwithstanding the alleged lack of tribal consultation, the Savannah District reports that it has held regular monthly "tribal consultation" meetings with representatives of the Muscogee Creek Nation since February 2020. Ex. 3 at 3. These consultations occur on the fourth Thursday of each month and continued at least until April 5, 2022, and presumably to this date. *Id.* Not surprisingly, there is no indication that the tribe ever used these consultations to provide information relevant to the Corps' jurisdictional determinations.

## ARGUMENT

Twin Pines is entitled to a preliminary injunction because "(1) [there is] a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is issued, and (4) an injunction would not disserve the public interest." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1273-74 (11th Cir. 2013) (quotation omitted).

I.   **Twin Pines is Likely to Succeed on the Merits**

   A.  **The ASA's Invalidation of Twin Pines' AJDs is Arbitrary, Capricious, and Contrary to Law**

The ASA's directive to invalidate Twin Pines' AJDs is unlawful because it is not warranted by "new information." The Corps has repeatedly assured landowners that AJDs "can be relied upon … for five years" subject to the limited exceptions described in Regulatory Guidance Letter 05-02.[12] The Regulatory Guidance Letter specifies just two exceptions: an AJD can be revised

---

[12] *See* Ex. 9, Regulatory Guidance Letter 08-02, Jurisdictional Determinations, at 2 (June 26, 2008), *available at* https://bit.ly/RGL08-02; *see also, e.g.*, Regulatory Guidance Letter 05-02 at 1,

(1) if "new information warrants revision of the determination before the expiration date"; or (2) if "a District Engineer has identified, after public notice and comment, that specific geographic areas with rapidly changing environmental conditions merit re-verification on a more frequent basis." Regulatory Guidance Letter 05-02 at 2. The proposed mine site is not in an area identified as meriting frequent re-verification. Therefore, Twin Pines' AJDs can be revised only based on new information. As directed by the Regulatory Guidance Letters, the Corps provided this same assurance on the face of the AJDs issued to Twin Pines, which both state they "will remain valid for a period of 5-years unless new information warrants revision prior to that date." Stanford Decl., Ex. A at 1, Ex. B at 1.

These written and unequivocal statements about the duration of the AJDs bind the Corps. They were communicated directly to Twin Pines expressly to invite reliance on them. As explained in Regulatory Guidance Letter 05-02, these limitations exist specifically "to provide certainty to the regulated public" and to "ensure[] their ability to rely on approved jurisdictional determinations … for a definite period of time." Ex. 2 at 1. Based on these commitments, the United States Supreme Court has confirmed that AJDs remain in effect for five years and can be revised only based on "new information." *See Hawkes*, 578 U.S. at 598. The Court also held that these restrictions are binding on the Corps. *Id.*

The ASA did not cite new information as a basis to rescind and invalidate Twin Pines' AJDs. Instead, he cited his "policy decision that the Corps should have honored [the Muscogee Nation's] government-to-government consultation request[]." Rescission Memo p. 2 ¶ 5. As explained above, it is unclear whether the tribe actually inquired before either AJD was issued.

---

2; Ex. 10, Regulatory Guidance Letter 16-01, Jurisdictional Determinations, at 3 (Oct. 2016), *available at* https://bit.ly/RGL-16-01; USACE Savannah District, Approved Jurisdictional Determinations, *available at* https://bit.ly/SAS-JD.

But even if it did, the ASA's disagreement with the prior policy of not granting such requests is not "new information" warranting reconsideration of an already-final AJD.

Moreover, even assuming the Corps could break explicit promises intended to induce reliance in some circumstances, it must — at a minimum — provide a rational explanation of its reasons for doing so. "[A]n agency's unexplained departure from precedent is arbitrary and capricious." *Int'l Longshore & Warehouse Union v. Nat'l Lab. Rels. Bd*., 971 F.3d 356, 360 (D.C. Cir. 2020). Reasoned decisionmaking demands that an agency disregarding established policy "display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silientio* or simply disregard rules that are still on the books." *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). "When its prior policy has engendered serious reliance interests"— as the Regulatory Guidance Letters and AJDs at issue here were expressly intended to do — "it would be arbitrary and capricious to ignore such matters." *Id.* That is exactly what happened here.

### B. The ASA's Decision to Invalidate Twin Pines' AJDs Based on Disagreement with Prior Policies is Impermissibly Retroactive

Given Twin Pines' reasonable reliance on explicit promises in the AJDs, the ASA's decision to invalidate them based on his post-issuance policy decision is impermissibly retroactive. Retroactive application of new regulations and policies is "highly disfavored" and is not justified in this case. *Sierra Club v. TVA*, 430 F.3d 1337, 1351 (11th Cir. 2005).

"A rule operates retroactively if it takes away or impairs vested rights." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010). A new policy that "changes the legal landscape," is "substantively inconsistent" with a prior agency practice, or "attaches new legal consequences to events completed before its enactment" operates retroactively. *Id.* If used as a basis to invalidate

already-final AJDs, the ASA's disapproval of the tribal consultation policies in effect when the AJDs were issued would do all of these things.

Agency rules can operate retroactively only if the agency has been authorized by statute to issue retroactive regulations; and even then, agency rules will be given retroactive effect only if their language requires this result. *See Jones Creek Invs., LLC v. Columbia Cnty., Georgi*a, 2016 WL 593631 *5 & n.5 (S.D. Ga. Feb. 12, 2016); *Sierra Club*, 430 F.3d at 1351. In this case there is no rule to interpret, because the agency has never promulgated rules governing tribal consultation on AJDs. And, while policies developed through adjudication — a category encompassing all case-by-case decisionmaking — can sometimes be applied retroactively, this is only permissible if "the resulting inequities are 'counterbalanced by sufficiently significant statutory interests.'" *Chadmoore Commc'ns, Inc. v. F.C.C.*, 113 F.3d 235, 240 (D.C. Cir. 1997). The ASA's retroactive policy decision fails this test.

Here, the ASA invalidated the AJDs based on new procedural requirements adopted after they were issued and after Twin Pines had been induced to rely on them. Yet the ASA did not acknowledge the inequities that would result from this retroactive policy decision, let alone identify any interest sufficient to counterbalance them. By failing to provide any such justification, the ASA failed to establish any basis upon which his action could be sustained under *Chadmore.*

### C. The ASA's Decision to Invalidate Twin Pines AJDs Before Determining if the Tribe Has Relevant New Information Was Arbitrary and Capricious

The decision to invalidate Twin Pines' AJDs without first determining if the tribe has "new information" warranting such action is the epitome of arbitrary and capricious agency action.

*First*, there is a reason "the Corps does not currently conduct, nor has it historically conducted" government-to-government consultation with either tribes or states regarding AJDs. Ex. 3 at 1. By law, jurisdictional determinations must be based on criteria established in the

17

applicable regulatory definition, which are limited to information about the physical and biological characteristics of a wetland or other water and their relation to other "waters of the United States." *See, e.g.,* 40 C.F.R. §§ 120.2(1), (3)(i), (3)(xvi). The first step — the wetland delineation — is governed by technical protocols in the Corps' 1987 Wetlands Delineation Handbook and guidance established by EPA. The second step is based on criteria in the regulatory definition. Stanford Decl. ¶ 19. Because the information needed to make these technical and legal determinations is readily available to the Corps based on site visits, satellite imagery, maps, and other similar information, *id.* ¶ 20, it is extraordinarily unlikely that a state, tribe or other third party will have relevant information that is not already available.

For these reasons, the previous ASA declared on January 4, 2021, as a matter of "nationwide programmatic policy," that the Corps should not engage in government-to-government consultations on AJDs, even when specifically requested by a tribe. Ex. 4 at 3. While recognizing the importance of tribal consultations generally, ASA James explained that AJDs perform a very "limited function" — determining if the Corps has jurisdiction — upon which such consultation "can have no functional impact." *Id.* at 2. The ASA noted that the regulatory definition of "waters of the United States" does not include a "public interest" component, and that other factors such as cultural impacts are also not relevant to the question of jurisdiction. *Id.*

The Corps provided a similar rationale in 1990 when it limited its administrative appeal process to landowners and others requesting an AJD — excluding third parties including states, tribes, and neighboring landowners. *See* 33 U.S.C. § 331.2 (restricting the definition of "affected part[ies]" with standing to appeal an AJD). As the Corps explained, third parties were excluded because AJDs are "primarily site-specific evaluations of technical criteria, such as tidelines or highwater marks, hydric soils, hydrophytic vegetation, wetland hydrology, and interstate

commerce connections" — factors third parties "do not typically have knowledge sufficient of, or sufficient interest in, … to become involved in such determinations." 65 Fed. Reg. 16486, 16488 (Mar. 28, 2000). The Corps also expressed concern that third parties given access to the appeal process would take the opportunity to inject considerations unrelated to the applicable criteria. The Corps noted that third party concerns often related to "issues other than effects to aquatic resources." *Id.* It suggested that such issues are "better addressed by local land use plans and zoning ordinances rather than by seeking to control potential development by challenging Corps JDs." *Id.* Similar considerations strongly support the Corps' prior policy of not engaging in government-to-government consultation on jurisdictional determinations, where the view expressed by tribes can have no functional impact.

*Second*, even if the ASA determined that tribes should be consulted on AJDs going forward, there was no justification for his decision to invalidate already-approved AJDs to allow such consultations to occur. Rather than preemptively pulling the rug out from under Twin Pines, the ASA could have instructed the Corps to consult with the tribe without invalidating the AJDs. In the unlikely event the tribe provided relevant new information warranting a revision, this information could have been used to take appropriate action without infringing vested rights.

The ASA's shoot first, ask questions later approach is especially troubling because the Corps has been holding regular monthly tribal consultation meetings from February 2020 to the present date. Ex. 3 at 3. If the tribe has information relevant to the AJDs, it has had ample opportunity to provide it both before and after the AJDs were issued. And the ASA has also had ample opportunity since taking office to direct the Corps to ascertain whether the tribe has relevant information to contribute. It was arbitrary and capricious for the ASA to invalidate the AJDs without pausing to ask this question, which would take no time to answer.

The ASA's precipitous decision to invalidate the AJDs when a less harmful but equally effective alternative was available suggests that invalidating the AJDs was the real objective. While citing the need for tribal consultation, the ASA also directed that a "new" AJD would be required, and that any new AJD would be based on the definition of "waters of the United States" in effect at the time of issuance. Rescission Memo p. 3 ¶ 5. This is the real significance of the ASA's directive. As Senator Ossoff's press release suggests, this impact, though ostensibly incidental, is far more consequential than requiring tribal consultation, a process that can have no functional impact on the AJDs for reasons discussed above. When the incidental impact of a decision vastly outweighs the asserted benefit, as here; and when the asserted benefit could have been obtained without causing such harmful impact; there is strong reason to believe the asserted justification is pretextual.

***Finally***, the ASA did not acknowledge, let alone justify, the severe impact his decision will have on Twin Pines. No effort was made to notify Twin Pines that its AJDs were in jeopardy, and the company was given no opportunity to explain the damage this would cause to its business and its employees. Twin Pines was not provided any "process" whatsoever. This complete failure by the ASA and the Corps to consider Twin Pines' vested rights and the other impacts resulting from the decision was arbitrary and capricious. *Wheeler*, 418 F. Supp. 3d at 1379 (agency action is arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.") (quotations omitted).

## II.     Twin Pines Will Suffer Irreparable Harm Absent an Injunction

Twin Pines will suffer irreparable harm if the ASA's decision is not enjoined. ***First***, as a direct result of the decision to rescind the AJDs, Georgia EPD has indefinitely halted all work

processing Twin Pines' applications for permits it needs to construct and operate the mine. Before the Corps even notified Twin Pines of the ASA's decision, Georgia EPD released a statement saying it was putting its pencils down:

> Given the Corps' recent action, Georgia EPD is deferring action on all applications for the Demonstration Mine until either any required 404 permit is issued by the Corps, the Corps determines that a new AJD is no longer needed, or the Corps determines that a 404 permit is not required. Following the conclusion of the federal process, EPD will assess what permits are required for the proposed Demonstration Mine and determine the best process for consideration of these permit applications moving forward.[13]

The indefinite delay in processing Twin Pines' permit applications, and the resulting uncertainty the ASA's decision has caused, is already harming Twin Pines' business. It is directly preventing the company from contracting with buyers and is interfering with its ability to secure needed investment and capital for its project. Ingle Decl. ¶¶ 13, 15-22.

As this Court recently recognized, delay in securing needed permits from Georgia EPD and resulting interference with business and contracting is a "distinct injury" and "irreparable harm" that supports issuance of an injunction. *See Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty.,* 540 F. Supp. 3d 1291, 1302–03, 1317–18 (S.D. Ga. 2021) (finding irreparable harm where county's action caused "Plaintiff's EPD permit application [to] remain pending indefinitely" and "hinder[ed], delay[ed], and obstruct[ed] Plaintiff's right to develop its property" and "[w]ithout issuance of an injunction, the EPD permitting process [would] not go forward," explaining: "Plaintiff suffers irreparable harm from the EPD's delayed permitting decision because Plaintiff is precluded from entering and finalizing solid waste disposal contracts with market participants"); *see also Pine Ridge Recycling, Inc. v. Butts Cnty.,* Ga., 864 F. Supp. 1338, 1342 (M.D. Ga. 1994) (finding irreparable harm where Plaintiff had not received a permit from Georgia EPD,

---

[13] Ingle Decl., Ex. B, Georgia EPD Permitting Update at 1–2.

could not begin construction of the proposed facility, and could not enter into disposal contracts). So too here.

*Second*, it is undisputed that the ASA's decision to invalidate the AJDs subjects Twin Pines to new — and significantly more expansive — jurisdictional rules than were in effect when the AJDs were issued. As a result, large areas of Twin Pines property that were not previously subject to Clean Water Act jurisdiction now will be. Ingle Decl. ¶ 16; Stanford Decl. ¶¶ 39-40. This precludes Twin Pines from developing those areas without renewing its application for a Section 404 permit — a process that would take years to complete. Ingle Decl. ¶ 17; Stanford Decl. ¶¶ 40-41. Given the business imperative to begin producing minerals soon, rather than waiting additional years, the company will have no choice but to amend its Surface Mining Permit application to avoid any potentially jurisdictional areas. Ingle Decl. ¶¶ 17-19. This decision will require the company to forgo development of 60% of its property, leaving minerals worth millions of dollars in the ground. *Id.*; Stanford Decl. ¶¶ 40, 42. If this is not irreparable harm then nothing is.

*Finally*, Twin Pines is continuing to incur costs that cannot be recouped each month that its project is delayed. The company has invested more than $47 million in the Saunders Demonstration Mine, including more than $28 million to purchase property for the mine and to purchase, transport and maintain mining and mineral processing equipment. Ingle Decl. ¶¶ 4, 23. The company must service debts on these purchases, and pay for ongoing storage, maintenance, and upkeep of the equipment it has purchased. *Id.* ¶ 23. Because the price that Twin Pines can charge for the minerals it produces "floats" — that is, it is set by the market price when the minerals are produced and become available for shipment — the company cannot pass these costs on to its customers. *Id.* Thus, any ongoing debt service and maintenance costs that Twin Pines incurs can never be recouped and come directly from the company's bottom line.

**III.**     <u>**The Balance of Harms and Public Interest Strongly Favor an Injunction**</u>

Finally, the balance of harms and public interest strongly favor an injunction. ***First***, no harm will result from enjoining the ASA's decision and reinstating the AJDs. As discussed above, the Corps has been conducting monthly tribal consultation meetings with the tribe since February 2020. It could easily use this process to ascertain whether the tribe has relevant new information warranting a revision to the AJDs. If relevant new information is produced at any time, it can be used as a basis to revise the AJDs without infringing vested rights. Furthermore, there is no risk that the company will take any action before such consultations could be completed, because Twin Pines must still obtain multiple permits from Georgia EPD before it can commence operation. Because these permits must be publicly noticed before they can be issued, there is more than enough time to determine if the tribes possess new information warranting a revision to the AJDs.

Conversely, Twin Pines will suffer extraordinary harm if the decision remains in effect pending a merits decision. Georgia EPD will not process its permit applications. *Id.* ¶ 11. Twin Pines cannot contract with purchasers or secure outside funding and capital investment. *Id.* ¶¶ 20-22. Employees will continue to lose the jobs they depend upon to feed their families. *Id.* ¶ 14. Twin Pines will continue to incur costs for debt service and equipment maintenance that can never be recovered. *Id.* ¶ 23. This balance of harms alone easily justifies an injunction.

***Second***, other public interest considerations weigh heavily in favor of granting preliminary relief. The mine will produce titanium and zirconium minerals, which have been designated as "critical minerals" important for the national economy and defense, but with supply chains vulnerable to disruption. *See* 30 U.S.C. § 1606(c); 87 Fed. Reg. 10381 (Feb. 24, 2022). The United States is currently heavily dependent upon adversarial foreign governments, including China, to

supply these minerals. The "concentration of global supply chains for strategic and critical material in China creates risk of disruption and of politicized trade practices."[14, 15]

As the Department of Defense recently explained: "Strategic and critical materials are the building blocks of a thriving economy and a strong national defense. They can be found in nearly every electronic device, from personal computers to home appliances, and they support high value-added manufacturing and high-wage jobs, in sectors such as automotive and aerospace."[16] Supply chains for these minerals "are at serious risk of disruption … and are rife with political intervention and distortionary trade practices." *Id.* "[T]his risk is more than a military vulnerability; in impacts the entire U.S. economy and our values." *Id.*

Given these concerns, Congress,[17] the Biden Administration,[18] and the Trump Administration[19] have all made clear that increasing domestic production of critical minerals and

---

[14] Secretary of Defense Lloyd J. Austin III, Defense Department's Strategic and Critical Materials Review (June 8, 2021), *available at* https://bit.ly/DOD-Review.

[15] Notably, China has actively worked to limit U.S. supplies of critical minerals, even going so far as to stage a disinformation campaign earlier this year, posing as environmental activists to oppose construction of a rare-earth mineral processing facility in Texas. *See* U.S. Dept. of Defense, Statement on Reports of Disinformation Campaign Against Rare Earth Processing Facilities (June 28, 2022), *available at* https://bit.ly/DOD-China; American Military News, Chinese impersonated Texans to sabotage critical US rare earth minerals plant, June 29, 2022, *available at* https://bit.ly/Military-News.

[16] The White House, Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017 at 152 (June 2021), *available at* https://bit.ly/100-Day-Review.

[17] *See* 30 U.S.C. § 1607(b) (finding that "critical minerals are fundamental to the economy, competitiveness, and security of the United States," that "to the maximum extent practicable, the critical mineral needs of the United States should be satisfied by minerals responsibly produced and recycled in the United States," and that "the Federal permitting process" is "an impediment to mineral production and the mineral security of the United States.").

[18] *See* Exec. Order No. 14,017, 86 Fed. Reg. 11849 (Feb. 24, 2021).

[19] *See* Exec. Order No. 13,953, 85 Fed. Reg. 62539 (Sept. 30, 2020); Exec. Order No 13,817, 82 Fed. Reg. 60835 (Dec. 20, 2017).

reducing the nation's dependence on foreign sources is in the national interest. The ASA's decision is contrary to the public interest for causing the federal permitting process to stand in the way of developing reliable domestic supplies of these nationally important minerals.

*Third*, while this case is about the arbitrary and capricious recission of Twin Pines AJDs and not the merits (or lack thereof) of claims regarding alleged environmental impacts from the mine, the environment will remain fully protected. The Saunders Demonstration Mine is subject to numerous state and federal environmental laws, and to the rigorous oversight and control of Georgia EPD through its environmental permitting. That process provides ample opportunity to evaluate, consider and address any concerns regarding environmental protections that may arise.

*Finally*, the public interest demands transparency, stability, and adherence to the rule of law. The circumstances of this case — including the Corps' representations regarding the term of AJDs and Twin Pines' reliance on them; the timing of the decision; statements from elected officials about the reasons for it; claimed justifications premised on an alleged complaint from April 2020 regarding the failure to consult on the AJDs that predates even the submission of Twin Pines' requests; and the complete failure to utilize obvious, readily available, and less harmful options to achieve its stated purpose — all call into question the basis for the decision. Too much is at stake for the regulated public not to be able to rely on their Government to follow its own policies and procedures, "to turn square corners," and to insist upon "reliability in their dealings with their Government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 (1984). These interests counsel in favor of enjoining the decision pending a ruling on the merits and, at the appropriate time, setting it aside.

Respectfully submitted this 8th day of July, 2022,

| | |
|---|---|
| JONES FORTUNA LP | GILBERT HARRELL SUMERFORD & MARTIN, P.C. |
| */s/ Lewis B. Jones* | |
| Lewis B. Jones* | */s/ Mark D. Johnson* |
| Georgia Bar No. 402498 | Mark D. Johnson |
| John L. Fortuna* | Georgia Bar No. 395041 |
| Georgia Bar No. 435149 | |
| *Admitted pro hac vice* | 777 Gloucester Street, Suite 200 |
| | Post Office Box 190 |
| 111 New Street, Suite A | Brunswick, Georgia 31520 |
| Decatur, GA 30030 | (912) 265-6700 |
| (404) 850-6138 | mjohnson@ghsmlaw.com |
| ljones@jonesfortuna.com | |
| jfortuna@jonesfortuna.com | |

*Counsel for Twin Pines Minerals, LLC*

## CERTIFICEATE OF SERVICE

I hereby certify that on July 8, 2022, I caused the foregoing Motion for Preliminary Injunction to be transmitted by U.S. Mail, Priority Mail Express, to the following recipients:

| | |
|---|---|
| Hon. Christine E. Wormuth | Hon. Michael L. Connor |
| Secretary of the Army | Assistant Secretary of the Army (CW) |
| 101 Army Pentagon | 108 Army Pentagon |
| Washington, DC 20310-0101 | Washington, DC 20310-0108 |
| | |
| Hon. Merrick B. Garland | U.S. Army Corps of Engineers |
| Attorney General of the United States | 441 G Street NW |
| U.S. Department of Justice | Washington, DC 20314-1000 |
| 950 Pennsylvania Avenue, NW | |
| Washington, DC 20530-0001 | Brig. Gen. Jason E. Kelly |
| | Division Commander |
| Lt. Gen. Scott A. Spellmon | USACE, South Atlantic Division |
| Chief of Engineers | 60 Forsyth Street, S.W. |
| 441 G Street NW | Atlanta, GA 30303-8801 |
| Washington, DC 20314-1000 | |
| | Civil Process Clerk |
| Col. Joseph R. Geary | Office of the United States Attorney |
| Commander | for the Southern District of Georgia |
| USACE Savannah District | 22 Barnard Street, Suite 300 |
| 100 W Oglethorpe Ave | Savannah, Georgia 31401 |
| Savannah, GA 31401-3604 | |
| | */s/ John L. Fortuna* |
| | Counsel for Twin Pines Minerals, LLC |